UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DAVID PINELLO,

                    Plaintiff,

        -against-                                    8:08-CV-00452 (LEK/RFT)


ANDREAS STIHL AG & CO. KG and
STIHL, INC.,

                    Defendants.
_____


## MEMORANDUM-DECISION AND ORDER


## I. INTRODUCTION

    Presently before the Court is a Motion for summary judgment and to exclude Plaintiff's

expert by Defendants Andreas Stihl AG & Co. KG and Stihl, Inc. (collectively, "Defendants")

against David Pinello ("Plaintiff"). Dkt. No. 80. Also before the Court is Defendants' Motion

for Rule 11 sanctions. Dkt. No. 81. In his Complaint, Plaintiff brings claims for negligence,

breach of warranty, and strict liability, based on allegations of design defect, manufacturing

defect, and failure to provide adequate warnings related to the STIHL TS 400. Dkt. No. 1. For

the reasons that follow, Defendants' Motion to exclude Plaintiff's expert is granted, Defendants'

Motion for summary judgment is granted, and Defendants' Motion for sanctions is denied.


## II. BACKGROUND

The accident at issue in this case occurred on December 2, 2004.  See Pl. 7.1 Statement ¶ 1 (Dkt. No. 85-1); Def. 7.1 Statement ¶ 1 (Dkt. No. 80-40).  Plaintiff was injured while allegedly using a STIHL TS 400 Cutquik cutoff machine to cut a section of eight-inch ductile iron pipe in an excavated trench near the intersection of Route 22 and Sullivan Park Road, in or near the town of Peru, New York.  See Pl. 7.1 Statement at 2; Def. 7.1 Statement at 2; Pinello Dep. at 174:3–175:6 (Dkt. No. 80-20).  The STIHL TS 400 is a hand-held, gasoline-powered tool that uses either an abrasive composite or abrasive diamond wheel to grind through certain types of materials, including asphalt, concrete and other masonry materials and various metals.  See Pinello Dep., Ex. 5 at 3-12 (Dkt. No. 80-25).

The TS 400 includes an instruction manual that provides its operator with certain warnings, including:

> **Warning!**
> Reactive forces may occur at any time the cutting wheel on a cutoff machine is rotating. If the wheel is slowed or stopped by frictional contact with any solid object or by a pinch, reactive forces may occur instantly and with great force.
>
> These reactive forces may result in the operator losing control of the cutoff machine, which may, in turn, result in serious or fatal injury.
>
> An understanding of the causes of these reactive forces may help you avoid loss of control. Reactive forces are exerted in a direction opposite to the direction in which the wheel is moving at the point of contact or pinch.
>
> **Pull-away, climbing, pinching and rotational forces.**
>
> The most common reactive forces are pull-away and climbing.  If the contact is at the bottom of the wheel, a cutoff machine will try to pull away from the operator (pull-away). If the contact is at the front of the wheel, the wheel may attempt to climb the object being cut (climbing).  Pinching occurs when the piece being cut closes on the wheel. If the wheel is severely pinched at the front, especially in the upper quadrant, the wheel may be instantly thrown up and back towards the operator with a great force in a rotational motion.

The greater the force generated, the more difficult it will be for the operator to control the cutoff machine. Any of the reactive forces can, in some circumstances, cause the operator to lose control of a cutoff machine, allowing the rotating wheel to come into contact with the operator. Severe personal injury or death can result.

**Reducing the Risk of Reactive Forces**

**Warning!**

Avoid cutting with the upper quadrant of the wheel where possible. If you must cut with this part of the wheel, be especially cautious for reactive forces and pinching.

Be alert to potential movement of the work piece or anything else that could cause the cut to close and pinch the wheel. In order to reduce the risk of pinching, support the work piece in such a way that the cut remains open during the cutting process and when the cut is finished.

Pinello Dep., Ex. 5 at 13-14.

The TS 400 also displays several on-machine warnings, including three warnings to read

the instruction manual and a large yellow label on the guard of the machine, located directly over

the thrust washers and bolt the operator must remove each time a cutting attachment is changed,

which contains the following warnings:

**Warning!**

Read and follow all safety precautions in owner's manual – improper use can cause serious or fatal injury.

5. Use only composite wheels marked "high speed reinforced" or diamond wheels that are approved for use on hand held, portable cutting-off machines and meet the requirements of ANSI B7.1.

6. Only STIHL-branded wheels or other wheels approved by STIHL are authorized. Unauthorized wheels may break and cause serious personal injury.

Def. TS 400 Photos (Dkt. No. 80-9).

The TS 400 cutoff machine (Serial Number 161281771) used during Plaintiff's accident

was manufactured by Andreas Stihl in Waiblingen, Germany on October 6, 2003. See Stihl

Answer to Interrogatories at 3 (Dkt. No. 80-12).  On October 31, 2003, it was shipped to Stihl

Incorporated, the U.S. importer of STIHL-branded products and an affiliate of ANDREAS

STIHL.  See Stihl Answer to Interrogatories at 3.  The product was purchased by Stihl Southeast,

an independent distributor of STIHL products, on January 8, 2004, and was sold to Best

Equipment in Miami, Florida, an independent power tool retailer, the following day.

According to the maintenance supervisor for Plaintiff's employer, Steven E. Fuller

Excavating, Inc., a vendor of cutting attachments, World Diamond Source, offered a free cutoff

machine – the buyer's choice of either a Stihl TS 400 or a Partner K 750 – with the purchase of

any twelve World Diamond Source-branded diamond abrasive wheels.  See Friedrich Dep. at 56-

57 (Dkt. No. 80-33).  Fuller Excavating purchased twelve of these wheels from World Diamond

Source, selected the STIHL TS 400 over the Partner K 750, and received the TS 400 as part of

this packaged deal.  Id.

Plaintiff, according to his testimony, is a highly experienced, professional user of hand-

held, gasoline- powered cutoff machines.  See Pinello Dep. at 93:13-17.  Prior to his accident, he

had used cutoff machines to cut pipes for 12-13 years.  See id. at 69:20 – 70:24.  On the day of

the accident, Plaintiff used a TS 400 equipped with a World Diamond Source diamond wheel to

cut and remove a section of an excavated ductile iron water main pipe.  See id. at 198-202.  A

telephone line ran parallel to the water main, between the pipe and Plaintiff's body, as he

attempted to cut the pipe.  Plaintiff reached over the telephone line with the TS 400 and angled

the machine sharply downward to allow it to fit between the water main and the telephone line.

See id. 203-205, 246-247, 285-287.

While Plaintiff was attempting to cut from this position, the pipe was moving and binding

4

the wheel because of inadequate support.  See Pinello Dep. at 278:13 – 279:13.  Before Plaintiff

attempted the cut on the water main pipe that resulted in the accident, a strap was placed on the

section of the pipe that was to be removed.  See Pinello Dep. at 250-252.  The other end of the

strap was attached to the boom of an excavator located outside the trench.  See Pinello Dep. at

250-252.  Plaintiff stated that before his accident he noticed the cutting attachment "starting to

get weak" and "wobbling."  See Pinello Dep. at 142:24 – 143:9.  Mr. Timmons and Mr. Downs,

employees of the Town of Peru who were observing the pipe cutting, testified during depositions

that they recognized the manner in which Plaintiff and his crew positioned the strap on the pipe

exerted too much upward pull against the pipe.  See Downs Dep. at 71-74 (Dkt. No. 80-31);

Timmons Dep. at 116 (Dkt. No. 80-37).  At the moment Plaintiff completed the cut he was struck

in the face.  See Pinello Dep. at 299:6-11.

 Plaintiff initiated this action by filing a Complaint in the United States District Court for

the Southern District of New York in January, 2008.  Dkt. No. 1.  In April 2008, this matter was

transferred to this Court.  See Dkt. No. 5.  On October 2, 2009, Defendants moved to exclude

Plaintiff's sole liability expert witness under Rule 37(c) because Plaintiff failed to timely serve

an expert disclosure in accordance with the Federal Rules of Civil Procedure after two extensions

of the filing deadline.  Dkt. No. 62.  The Court entered an order imposing monetary sanctions

against Plaintiff, but allowed the case to proceed.  Dkt. No. 76.  Plaintiff ultimately served the

report of his liability expert, Mr. Philip O'Keefe ("Mr. O'Keefe"), on September 30, 2009.  See

O'Keefe Report (Dkt. No. 80-18).

 Mr. O'Keefe's report concluded that "under normal use, the Stihl TS 400 is inherently

and unreasonably dangerous when used as a hand-held tool," and that the TS 400 instruction and

safety manuals provide inadequate and confusing warnings with regard to the dangers associated

with kickback.  O'Keefe Report at 4.  To reach these conclusions, Mr. O'Keefe did a

mathematical analysis, which compared the machine's peripheral blade speed to established

human reaction times to show that, when kickback occurs, the blade will reach the worker's face

before the operator will be able to react to it.  O'Keefe Report ¶¶ 10-19.

In his subsequent deposition testimony, Mr. O'Keefe revised the opinion in his written

report that the TS 400 was unreasonably dangerous "under normal use," stating that "[i]t's

dangerous as a handheld tool in this type of application where Mr. Pinello was hurt [a trenching

application]" and that "[i]t's my opinion that in other applications, it can be used safely."

O'Keefe Dep. at 160-61.  In his deposition, Mr. O'Keefe also stated that he was not aware at that

time of any manufacturing or design defects in the TS 400.  O'Keefe Dep. at 184.

Plaintiff was also deposed by Defendants regarding the circumstances of the accident.

With respect to the incident itself, Plaintiff testified as follows:

> Q. Do you have a recollection about the moment that the accident occurred whether both of your hands stayed on the machine or not.
>
> A. Yeah.  I mean, I was holding it as best I could.
>
> Q. Do you have any recollection of either both hands coming off –
>
> A. No.
>
> Q. The handle? -- Do you have a recollection of whether or not there was any change in the engine's sound at the moment of the accident, speedup, slow down, any change in the engine?
>
> A. Everything just happened so fast. It was – I can't really tell you exactly what happened.
>
> Q. Alright. Did you – did you fall down, stand upright?
>
> A. I went back.  I fell down.

\*\*\*

6

Q. Tell me everything you can recall from that point on, what happened?

A. I fell backwards down in the bed and he was working behind me, somewhat to the left, right, I can't tell you for sure.

Q. In the trench?

A. Yeah. I flew back into him, then I just -- I mean, it's like somebody hit me with a bat or something.

Q. You fell back into Ben?

A. Yeah.

Q. Ok.  Physically contacted him as you fell back?

A. Yeah.

Q. Ok.  What else do you recall?

A. Just sitting like this and I remember feeling around my mouth with my tongue, I could feel there were teeth missing.

Pinello Dep. at 290–292.

When asked about the cut that Plaintiff made which resulted in the accident, Plaintiff

testified as follows:

Q. You recognize that when you made cut B, that it was an awkward and difficult and dangerous cut that you were making, did you not?

A. Yes.

Q. Okay. And that was -- And so once you had attempted and made cut B, you had the option of trying to do something to make -- to not have to try to make a second awkward and dangerous cut, did you not?

A. I had the option to?

Q. Yes, calling the telephone company or taking steps to get those wires out of the way.

A. You mean from B to A?

Q. Yeah.

A. Yes.

Q. Did you say anything to the foreman about it? Did you say look, this is awkward, it's dangerous, we need to do something to get this out of the way? Did you point it out to them? Did you ask them, did you do anything to call his attention to the fact that it was an awkward and dangerous cut?

7

A. No.

Pinello Dep. at 366:2-367:7.

Plaintiff testified that he could not recall reading any of the warnings posted on the cutoff machine or in its manual because he never felt the need to consult warnings or instructions for tools with which he was familiar. See Pinello Dep. at 112:7-12; 92:19 – 93:4. However, during his deposition, the warnings relevant to the present case were read to him, and he acknowledged that he already knew the information contained in those warnings before and during his accident:

> Q. Okay. Look over, if you would, to page 13 [of the TS 400 instruction manual], under the section that says in the third column that says reactive forces -- warning, reactive forces may occur at any time the cutting wheel on a cutoff machine is rotating. That's something known to you before and at the time of your accident?
>
> A. Yeah.
>
> Q. If the wheel is slowed or stopped by frictional contact with any solid object or by a pinch, reactive forces may occur instantly and with great force. Is that something that was known to you prior to and at the moment of your accident?
>
> A. Yeah.
>
> Q. These reactive forces may result in the operator losing control of the cutoff machine which may in turn result in serious or fatal injury. Is that something that you knew at or prior to the time of your accident, that reactive forces could cause an operator to lose control of a machine?
>
> A. Yeah.
>
> Q. You knew that?
>
> A. I knew that you can get hurt severely, yeah, by these things if they kickback in your face.
>
> Q. I'm sorry?
>
> A. I knew that you can get hurt, hurt by these things, yeah.
>
> Q. Okay, but could -- did you know you could lose control because of reactive forces occurring between the interaction between the cutting tool and a workpiece?
>
> A. I mean, that's a little technical for me to understand, but in laymen's terms, if something pinches it, yeah, it can jump back and hit you in the face.
>
> Q. Okay, and you knew that?

8

A. Yeah.

Q. Prior to and at the time of your accident?

A. Yeah.

Q. Okay. An understanding of the causes of these reactive forces may help you avoid loss of control. Reactive forces are exerted in a direction opposite to the direction in which the wheel is moving at the point of contact or pinch. And I think we discussed earlier the old high school law of physics, for every action there is an equal and opposite reaction?

A. Yeah.

Q. So that is something that you knew at least in laymen's terms prior to and at the time of the accident, is that correct?

A. Yes.

Q. Reactive forces are exerted in a direction opposite to the direction in which the wheel is moving at the point of contact or pinch. Something you knew at or before or at the moment of your accident or not?

A. Yes, I knew that.

Q. All right. Pinching occurs when the piece being cut closes on the wheel.

A. Yes.

Q. That was something you knew?

A. Yes.

Q. Okay. If the wheel is severely pinched at the front, especially in the upper quadrant, the wheel may be instantly thrown up and back towards the operator with a great force in a rotational motion. Is that something you knew?

A. Yes.

Q. Okay. The greater the force generated, the more difficult it will be for the operator to control the cutoff machine, is that something you knew?

A. Yeah.

Q. … Any of the reactive forces that we've been talking about in this paragraph, any of them, can in some circumstances cause the operator to lose control of the machine allowing the rotating wheel to come into contact with the operator. Is that something you knew?

A. Yeah.

Q. Okay. Prior to your accident?

A. Yes.

9

Q. Okay. Severe personal injury or death can result. That's self explanatory, something you knew?

A. Yes.

*******

Q. All right. Okay, in this next column, avoid cutting with the upper quadrant of the wheel where possible. Is that something you were aware of?

A. Yeah.

Q. And the reason for avoiding cutting with the upper quadrant was that's where the most reactive forces in a kickback mode can take place, correct?

A. Yes.

Q. That's something you know with cutoff machines and it's something you know with chainsaws, correct?

A. On the tip of a chainsaw, I know that.

Q. Yeah, okay. And this -- And that's all information that was known to you prior to your accident, is it not?

A. Yeah.

Q. Okay.

A. Just from experience of using them.

Q. Okay, I understand. If you must cut with this part of the wheel, be especially cautious for reactive forces and pinching.  Is that something you knew, that if you were using the upper quadrant, you had to be especially careful?

A. Yes.

Q. All right. Be alert to potential movement of the workpiece or anything else that could cause the cut to close and pinch the wheel. Something you knew --

A. Yes.

Q. -- prior to the accident?

A. Yes.

Q. Okay. In order to reduce the risk of pinching, support the workpiece in such a way that the cut remains open during the cutting process and when the cut is finished. Something you knew?

A. Yes.

See Pinello Dep. at 313-325.

## III. MOTION TO EXCLUDE EXPERT TESTIMONY

### A. Legal Standard

Expert testimony is evaluated under Federal Rule of Evidence 702, **which provides:**

**If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.**

The Supreme Court has held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). This gatekeeping function applies to scientific expert testimony as well as technical and other specialized knowledge such as engineering. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147-48 (1999).

The court's inquiry under Daubert focuses not on the substance of the expert's conclusions, but on the principles and methodology used to generate the conclusions. Daubert, 509 U.S. at 595. To assist with this inquiry, the court may consider the following factors laid out in Daubert: (1) whether the expert's technique or theory can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a high known or potential rate of error; and (4) whether it is generally accepted in the relevant scientific community. Kumho, 526 U.S. at 149-50 (citing Daubert, 509 U.S. at 592-94). This list "neither necessarily nor exclusively applies to all experts or in every case." Id. at 141. Indeed, the trial court has "the same kind of latitude in deciding how to test an expert's reliability . . . as it enjoys when it

decides whether or not that expert's relevant testimony is reliable." Id. at 152.

Under this framework, courts first examine whether the proposed witness qualifies as an expert; that is, whether the proposed witness has specialized knowledge, skill, experience, training, or education that would assist the trier of fact in understanding the evidence or deciding on particular issues in the case. Aspex Eyewear, Inc. v. Altair Eyewear, Inc., 485 F. Supp. 2d 310, 318 (S.D.N.Y. 2007) (citing Baker v. Urban Outfitters, Inc., 254 F. Supp. 346, 352 (S.D.N.Y. 2003)); see also Nora Beverages, Inc. v. Perrier Group of America, Inc., 164 F.3d 736, 746 (2d Cir. 1998).

Second, the court must examine the relevance and reliability of the proposed expert testimony. With respect to reliability, "[t]he district court should consider the indicia of reliability identified in Rule 702: (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." Aspex, 483 F. Supp. 2d at 319 (citations and internal quotations omitted).

B. Plaintiff's Proposed Expert

Here, Defendants seek to exclude Mr. O'Keefe from testifying by arguing that he "lacks the qualifications to render expert opinions regarding the design, manufacture, or warnings for a hand-held gasoline-powered cutoff machine, and he offers only unreliable and unsupported opinions that are inadmissible under Daubert." Defendants' Motion for Summary Judgment and to Exclude Plaintiff's Experts ("Def. Mot. for SJ") at 22. Defendants also argue that without Mr. O'Keefe's testimony, Plaintiff does not have a viable theory of defect or causation, and therefore Plaintiff should be granted summary judgment. Defendant's Reply to response to motion for

12

summary judgment ("Def. Reply") at 10-13 (Dkt. No. 88).

### 1. Mr. O'Keefe's Qualifications

Defendant contends that Mr. O'Keefe lacks the qualifications to render opinions regarding the design, manufacture, or warnings for a hand-held gasoline-powered cutoff machine, and that he offers only unreliable and unsupported opinions that are inadmissible under Daubert. Plaintiff argues that Mr. O'Keefe is qualified to offer his opinion regarding the design, manufacture, and warnings for a cutoff machine. Plaintiff points out that O'Keefe has degrees in both mechanical engineering and electrical engineering and, more particularly, worked as an engineer for power tool manufacturer Echo, and they claim that this work history has afforded him specific experience designing and testing outdoor machinery. See O'Keefe Report at 2 (Dkt. No. 64-4) and O'Keefe CV (Dkt. No. 85, Ex. M).

Plaintiff also points out that Mr. O'Keefe has substantial experience with the design and testing of outdoor power equipment and has participated in the design of various handheld power tools, both gasoline powered tools and electric tools. O'Keefe Dep. at 90-91, 93. Also, while at Echo, he made recommendations concerning manuals. O'Keefe Dep. at 94. Finally, as part of his job at Echo, he performed testing with a cutoff machine and also managed field testing for cutoff machines. O'Keefe Dep. at 97, 104-105.

In contrast, Defendants argue that Mr. O'Keefe has never actually performed design work on a "hand- held gasoline-powered cutoff machine." Def. Mot. for SJ at 22. However, the amount of specific experience that Defendants suggest is required to overcome a Daubert challenge is far beyond that required by any court. Indeed, if the Court were to require Plaintiff

13

to produce an expert that meets Defendants' specifications, this may very well exclude all but Defendants' own employees.

Based on Mr. O'Keefe's education and professional experience, the Court finds that he is sufficiently qualified to render an expert opinion regarding the subject cutoff machine, the hazard associated with kickback, and the hazard of making cuts with the upper front quadrant of the machine's cutting attachment. While Mr. O'Keefe has no specific experience with the cutoff machine at issue, he has significant engineering experience with designing and testing outdoor power equipment, and he has performed testing with a cutoff machine and managed field testing for cut off machines. O'Keefe Dep. at 94, 97, 104-105. That his experience centers on various handheld power tools, and does not extensively involve handheld cutoff machines, goes to the weight of his testimony, not its admissibility. See, e.g., Humphrey v. Diamant Boart, Inc., 556 F. Supp. 2d 167 (E.D.N.Y. 2008) (expert's "generalized engineering education and experience, combined with his specific work on machine guarding in several instances, qualifies him to testify with regard to guarding on power saws, despite his failure to have any particular expertise in saws") (citing McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1043 (2d Cir. 1995)); Mahoney v. JJ Weiser and Co., Inc., No. 04 Civ. 2592, 2007 WL 3143710, at *7 (S.D.N.Y. Oct. 25, 2007) ("Defendants' contention that [plaintiffs' proposed expert] does not have experience with the precise type of insurance policy in issue here goes to the weight of [his] testimony, not its admissibility.")

### 2. Factual Foundation and Methodology

"When an expert opinion is not supported by sufficient facts to validate it in the eyes of

14

the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993). The Second Circuit has instructed that "expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison . . . ." Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (citations and internal quotations omitted). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Electric Co. v. Joiner, 522 U.S. 136 (1997).

Here, Defendants argue that Mr. O'Keefe's opinions should be excluded because "[n]o testing was done and no research conducted," "[n]o conclusion was tested, published, or peer reviewed," "[n]o support for any opinion was found in standards, in professional literature, in patents, or in the design of other cut-off machines," and Mr. O'Keefe did not visit the accident scene, interview witnesses, or consider evidence beyond Plaintiff's deposition transcript. Def. Mot. for SJ at 33.

Plaintiff responds that it is important to keep in mind that the parties agree regarding the hazards associated with the cutoff machine kicking back arise when the upper front quadrant of the cutting attachment is caught or pinched. Plaintiff's Response in opposition to motion for summary judgment ("Pl. Response") at 30 (Dkt. No. 85). Plaintiff claims that the primary area of expert analysis for Mr. O'Keefe in this case is to explain in engineering terms that Mr. Pinello

experienced a kickback that occurred with such speed and force that even an operator who is firmly holding the machine will be unable to react or protect himself. Id. at 30.  Plaintiff points to Mr. O'Keefe's analysis, which includes mathematical equations to compare the machine's peripheral blade speed to established human reaction times.  O'Keefe Report ¶¶ 10-19.  This mathematical analysis purports to show why the blade will reach the worker's face long before the operator would be able to react to it.  Id.

The Court finds that Mr. O'Keefe's expert testimony should be precluded because it does not rest on a reliable foundation.  First, it is noteworthy that Mr. O'Keefe's expert testimony fails to satisfy even one of the four factors outlined in Daubert.  Mr. O'Keefe readily admits that his analysis regarding the dangers of the TS 400 has not been tested.  O'Keefe Dep. at 180.  Mr. O'Keefe also acknowledges that he has not submitted his analysis for peer review.  O'Keefe Dep. at 107.  Neither Plaintiff nor Mr. O'Keefe make any reference to the known or potential rate of error of his analysis.  And finally, neither Mr. O'Keefe nor Plaintiff give any indication that his analysis is generally accepted in the relevant scientific community.  To the contrary, during his deposition, Mr. O'Keefe conceded that he did not know of a comparable analysis in the professional literature.  O'Keefe Dep. at 107.

While it is true that the Daubert factors are not necessarily exhaustive in determining whether expert testimony should be admitted, Kumho, 526 U.S. at 141, Plaintiff has provided no basis for the Court to believe that Mr. O'Keefe's conclusion "has been arrived at in a scientifically sound and methodologically reliable fashion." Ruiz v. Pepsi Cola of Puerto Rico Bottling Company, 161 F. 3d 77, 85 (1st Cir. 1998).  The Court therefore grants Defendants' Motion to exclude Mr. O'Keefe's expert testimony.

16

### 3. Summary Judgment Based Upon Preclusion of Expert Testimony

It is a fundamental principle under New York law that a plaintiff must present evidence of a product defect to prevail in a product liability suit under any theory of liability. "[W]hether the action is pleaded in strict products liability, breach of warranty or negligence, it is a consumer's burden to show that a defect in the product was a substantial factor in causing injury and . . . that the defect complained of existed at the time the product left the manufacturer . . . ." Tardella v. RJR Nabisco, Inc., 178 A.D.2d 737, 737 (N.Y. App. Div. 3d Dep't 1991).

To carry this burden, a plaintiff must present expert testimony, and where a plaintiff's expert's opinion and testimony in a product liability action is precluded, plaintiff's liability theories are no longer viable and summary judgment is appropriate. See Quintanilla v. Komori Am. Corp., 2007 U.S. Dist. LEXIS 33126, 24 (E.D.N.Y. 2007) ("Having ruled that plaintiff's proposed expert testimony is inadmissible, plaintiff 'has no evidence to support his claim[s] that amounts to [any]thing more than that he was injured' while using a printing press manufactured by defendant."); see also Brooks v. Outboard Marine Corp., 234 F.3d 89, 92 (2d Cir. 2000) (finding summary judgment proper where plaintiff's expert was excluded and thus plaintiff had no evidence in the record to support a claim for design defect); see Russo v. JIL Industries, 2006 U.S. Dist. LEXIS 97269 (N.D.N.Y.2006) ("Because [excluded expert's] testimony is central to plaintiffs' causes of action, the complaint will be dismissed in its entirety"); see Trumps v. Toastmaster, Inc., 969 F. Supp. 247, 254 (S.D.N.Y. 1997) ("It follows from the exclusion of [plaintiff's expert's] opinion evidence that [defendant's] motion for summary judgment must be granted.").

Without Mr. O'Keefe's testimony, Plaintiff fails to show how the subject cutoff machine was defective. It follows, therefore, that Plaintiff cannot assert a claim that requires such a showing. The Court finds that Plaintiff's product liability claims should be dismissed because Mr. O'Keefe's testimony has been excluded. However, even if Mr. O'Keefe's testimony was admitted, the Court finds that Plaintiff's claims should be dismissed. As the Court discusses below, regardless of whether Mr. O'Keefe's testimony is admitted, Defendant is entitled to summary judgment with respect to Plaintiff's claims for negligence, breach of warranty, and strict liability.

## IV. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

The standard for summary judgment is well-established. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A material fact is genuinely disputed only if, based on that fact, a reasonable jury could find in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). On a motion for summary judgment, all evidence must be viewed and all inferences must be drawn in a light most favorable to the nonmoving party. See City of Yonkers v. Otis Elevator Co., 844 F.2d 42, 45 (2d Cir. 1988).

The party seeking summary judgment bears the initial burden of "informing the district

18

court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Upon the movant's satisfying that burden, the onus then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), but "must set forth specific facts showing that there is a genuine issue of fact for trial." First Nat'l Bank of Az. v. Cities Serv. Co., 391 U.S. 253, 288 (1968).

### B. Strict Liability

Plaintiff asserts claims under strict liability for failure to warn, design defect, and manufacturing defect. Compl. at 48-51.

#### 1. Failure to Warn

A plaintiff asserting a failure to warn claim must establish: (1) the manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that failure to do so was the proximate cause of the harm. Barban v. Rheem Textile Systems, Inc., No. 01-CV-8475, 2005 WL 387660, at *9 (E.D.N.Y. Feb. 11, 2005). New York recognizes two circumstances in which a manufacturer has no duty to warn of known of foreseeable dangers: first, where the dangers are obvious; and second, where the user is fully aware of those dangers. Id. (citations omitted). The Court finds that the second exception applies because, based upon the record before the Court, Plaintiff was fully aware of the dangers of making the cut that led to his injury.

19

Specifically, based upon Plaintiff's responses during his own deposition, there is no question that he was fully aware of the risks presented by the cut he was making. The Court finds that there is no genuine issue of material fact as to whether Plaintiff was a knowledgeable user who was aware of the risks that resulted in the accident at issue. The Court, therefore, concludes that Plaintiff's failure to warn claim should be dismissed under the knowledgeable user exception.

While it is true that a plaintiff must have actual knowledge of the specific hazard for the knowledgeable user exception to apply, see Donald v. Shinn Fu Co. of America, No. 99 Civ. 6397, 2002 WL 32068351 at *9 (E.D.N.Y. Sept. 4, 2002) (citations omitted), Plaintiff's deposition testimony demonstrates that he was aware of the particular danger at issue here. Plaintiff clearly stated during his deposition that he knew before and during the incident that the cut he was making was dangerous and difficult cut and that he had other options for reducing the risk of personal injury:

> Q. You recognize that when you made cut B, that it was an awkward and difficult and dangerous cut that you were making, did you not?
>
> A. Yes.
>
> Q. Okay. And that was -- And so once you had attempted and made cut B, you had the option of trying to do something to make -- to not have to try to make a second awkward and dangerous cut, did you not?
>
> A. I had the option to?
>
> Q. Yes, calling the telephone company or taking steps to get those wires out of the way.
>
> A. You mean from B to A?
>
> Q. Yeah.
>
> A. Yes.
>
> Q. Did you say anything to the foreman about it? Did you say look, this is awkward, it's dangerous, we need to do something to get this out of the way? Did you point it out to them? Did you ask them, did you do anything to call his attention to the fact that it was an

20

awkward and dangerous cut?

A. No.

Pinello Dep. at 366:2-367:7.313:22-323:10.323:12-325:4.

It is also clear from Plaintiff's deposition testimony that he understood the machine he

was using, like all power tools with rotating parts, is subject to reactive forces, and that certain

steps must be followed to control the machine and minimize the risks related to those forces.

During his deposition, Plaintiff was read various statements regarding the danger of reactive

forces from the TS 400 instruction manual.  It is clear that Plaintiff understood the risks and

precautions associated with reactive forces and the TS 400:

Q. Okay. Look over, if you would, to page 13 [of the TS 400 instruction manual], under the section that says in the third column that says reactive forces -- warning, reactive forces may occur at any time the cutting wheel on a cutoff machine is rotating. That's something known to you before and at the time of your accident?

A. Yeah.

Q. If the wheel is slowed or stopped by frictional contact with any solid object or by a pinch, reactive forces may occur instantly and with great force.  Is that something that was known to you prior to and at the moment of your accident?

A. Yeah.

Q. These reactive forces may result in the operator losing control of the cutoff machine which may in turn result in serious or fatal injury.  Is that something that you knew at or prior to the time of your accident, that reactive forces could cause an operator to lose control of a machine?

A. Yeah.

Q. You knew that?

A. I knew that you can get hurt severely, yeah, by these things if they kickback in your face.

Q. I'm sorry?

A. I knew that you can get hurt, hurt by these things, yeah.

Q. Okay, but could -- did you know you could lose control because of reactive forces occurring between the interaction between the cutting tool and a workpiece?

A. I mean, that's a little technical for me to understand, but in laymen's terms, if something pinches it, yeah, it can jump back and hit you in the face.

21

Q. Okay, and you knew that?

A. Yeah.

Q. Prior to and at the time of your accident?

A. Yeah.

Q. Okay. An understanding of the causes of these reactive forces may help you avoid loss of control. Reactive forces are exerted in a direction opposite to the direction in which the wheel is moving at the point of contact or pinch. And I think we discussed earlier the old high school law of physics, for every action there is an equal and opposite reaction?

A. Yeah.

Q. So that is something that you knew at least in laymen's terms prior to and at the time of the accident, is that correct?

A. Yes.

Q. Reactive forces are exerted in a direction opposite to the direction in which the wheel is moving at the point of contact or pinch. Something you knew at or before or at the moment of your accident or not?

A. Yes, I knew that.

Q. All right. Pinching occurs when the piece being cut closes on the wheel.

A. Yes.

Q. That was something you knew?

A. Yes.

Q. Okay. If the wheel is severely pinched at the front, especially in the upper quadrant, the wheel may be instantly thrown up and back towards the operator with a great force in a rotational motion. Is that something you knew?

A. Yes.

Q. Okay. The greater the force generated, the more difficult it will be for the operator to control the cutoff machine, is that something you knew?

A. Yeah.

Q. ... Any of the reactive forces that we've been talking about in this paragraph, any of them, can in some circumstances cause the operator to lose control of the machine allowing the rotating wheel to come into contact with the operator. Is that something you knew?

A. Yeah.

Q. Okay. Prior to your accident?

A. Yes.

Q. Okay. Severe personal injury or death can result. That's self explanatory, something you knew?

22

A. Yes.

Pinello Dep. at 313:22-323:10.

Finally, Plaintiff stated during his deposition that he was specifically aware of the danger associated with making cuts in the upper quadrant. The Court notes that Plaintiff clearly states that before and during the accident he was aware of the risk of kickback that he now claims is the basis for his products liability lawsuit:

Q. All right. Okay, in this next column, avoid cutting with the upper quadrant of the wheel where possible. Is that something you were aware of?

A. Yeah.

Q. And the reason for avoiding cutting with the upper quadrant was that's where the most reactive forces in a kickback mode can take place, correct?

A. Yes.

Q. That's something you know with cutoff machines and it's something you know with chainsaws, correct?

A. On the tip of a chainsaw, I know that.

Q. Yeah, okay. And this -- And that's all information that was known to you prior to your accident, is it not?

A. Yeah.

Q. Okay.

A. Just from experience of using them.

Q. Okay, I understand. If you must cut with this part of the wheel, be especially cautious for reactive forces and pinching. Is that something you knew, that if you were using the upper quadrant, you had to be especially careful?

A. Yes.

Q. All right. Be alert to potential movement of the workpiece or anything else that could cause the cut to close and pinch the wheel. Something you knew --

A. Yes.

Q. -- prior to the accident?

A. Yes.

Q. Okay. In order to reduce the risk of pinching, support the workpiece in such a way that the cut remains open during the cutting process and when the cut is finished. Something you knew?

A. Yes.

Pinello Dep. at 323:12-325:4.

Plaintiff now attempts to rebut his own deposition testimony by submitting a declaration stating that he "did not believe that the cut that [he] was performing was dangerous or posed an immediate risk of death or serious harm." Pinello Decl. (Dkt. No. 85-11). The Court begins by noting that Plaintiffs are not permitted to salvage meritless claims by changing their testimony. "In Perma Research and Development Co. v. The Singer Company, 410 F.2d 572 (2d Cir. 1969), the Second Circuit established the cardinal rule that a party cannot defeat a motion for summary judgment by proffering an affidavit that contradicts in material respects his prior sworn deposition testimony." FDIC v. Wrapwell Corp., Dkt. No. 93 Civ. 859, 2002 U.S. Dist. LEXIS 76, 42-43 (S.D.N.Y. January 2, 2002). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Perma Research & Dev. Co., at 578.

Plaintiff is clearly trying to revoke prior sworn testimony in which he made admissions that are fatal to his failure to warn claim. Plaintiff relies on the claim that his prior admissions only indicated that "he was generally aware of the risk of reactive forces," and that he was not aware of the specific risks of highspeed kickback prior to his accident. Pl. Response at 22. Specifically, Plaintiff argues that his deposition testimony regarding kickback was based upon the mistaken belief that he was being asked what he now knows about the dangerous cutting position in which he placed himself, not what he knew at the time of the accident. Id. at 22-23. Plaintiff bases this argument on the tense of one verb in one question in a 367-page deposition

transcript ("recognize" rather than "recognized") that is otherwise replete with admissions that at the time of the accident he knew of the risks he now denies having known. Id.

However, even the language of the single question cited by Plaintiff and the context in which it was asked make clear that Pinello was testifying about his knowledge at the time of his accident. See Pinello Dep. at 366:2-367:7. The Court finds, based upon Plaintiff's deposition testimony, that Plaintiff testified unequivocally that he knew before and at the time of his accident that: (1) reactive forces may occur at any time the cutting wheel on a cutoff machine is rotating; (2) if the wheel is slowed or stopped by frictional contact with any solid object or by a pinch, reactive forces may occur instantly and with great force; (3) these reactive forces may result in him losing control of the cutoff machine; (4) the risk of losing control of the machine because of reactive forces is particularly acute when making a cut in the upper quadrant of the wheel; (5) once the loser uses control of the machine because of these reactive forces, it will "jump back and hit you in the face," and may result in serious or fatal injury. See Pinello Dep. at 313:22-323:19; 323:12-325:4; 366:2-367:7. There is no genuine issue of material fact as to whether the knowledgeable user exception applies, and the Court finds that Plaintiff's failure to warn claim should be dismissed.

2. Design Defect

Generally, a plaintiff seeking to impose strict liability for a design defect must show that: (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing the plaintiff's injury. See Ferracane v. United States, No. 02 Civ. 1037, 2007 U.S. Dist. LEXIS 6569 at *5 (E.D.N.Y. Jan. 30, 2007); Colon v. Bic USA, Inc., 199 F. Supp. 2d 53, 86 (S.D.N.Y. 2001).

To satisfy the second element, it is "well established in New York state courts that in order to establish a *prima facie* case based on a design defect, plaintiff must offer evidence that it was feasible to design the product in a safer manner and that the proposed design would have prevented some of plaintiff's injuries." Ferricane at *15-16.

For the design defect claim, Plaintiff relies on the testimony of Mr. O'Keefe that the saw, as designed, should have included a warning that the "operator should not cut with the upper front quadrant of the cutting attachment." Pl. Response at 24-25. However, as discussed above, Plaintiff cannot establish a substantial likelihood of harm because Mr. O'Keefe's testimony has not satisfied the Daubert test for reliability. Plaintiff has therefore failed to submit any evidence to satisfy the first element of a design defect claim.

Even if Mr. O'Keefe's testimony were admitted, Plaintiff has not submitted evidence that it was feasible to design the product in a safer manner and that the proposed design would have prevented some of Plaintiff's injuries. In his report, Mr. O'Keefe does not reference an alternative design that he believes is feasible, safer, and would have prevented Plaintiff's injuries. O'Keefe Report. During his deposition, Mr. O'Keefe did mention a Wachs machine, stating: "Well, I guess the way I'm looking at is perhaps the [TS 400] isn't suitable for that type of an application. It may be better to use the Wachs machine that I talked about." See O'Keefe Dep. at 188:7-10. This testimony merely indicates that Mr. O'Keefe thinks the Wachs machine "may be better" for cuts in the upper quadrants; and it falls short of stating that he believes it was feasible to design the product in a safer manner and that the proposed design would have prevented some of Plaintiff's injuries.

Moreover, even if Mr. O'Keefe had given testimony that supports the Wachs as a

feasible, safer alternative design, the Wachs machine is not even an alternative design for a hand-held cutoff machine.  Instead, it is an entirely different type of tool.  "Under New York law, a manufacturer cannot be held liable for failing to adopt an alternative product design that has not been shown to retain the 'inherent usefulness' the product offers when manufactured according to the more risky (but otherwise lawful design) that was actually used."  Rose v. Brown & Williamson Tobacco Corp., 53 A.D.3d 80, 82 (2008), citing Voss v. Black & Decker Mfg. Co., 59 NY2d 102, 108 (1983).

In the present case, Plaintiff does not offer an alternative design that might retain the "inherent usefulness" of a handheld cutoff machine; rather, they point to an entirely different product that is not handheld and, by their own expert's admission, does not have nearly the same functionality as the TS 400.  In his deposition testimony, Mr. O'Keefe readily admits that the Wachs machine is not a "substitute" for the TS 400, and agrees that it cannot make many of the cuts that a handheld cutoff can make, such as "cutting walls" and "cutting vertical surfaces."  O'Keefe Dep. at 189.  Nor does Plaintiff submit any other evidence, beyond the proposed testimony of Mr. O'Keefe, that the Wachs machine retains the "inherent usefulness" of the TS 400.  Therefore, the Court finds that there is no genuine issue of material fact with respect to whether it was feasible to design an alternative to the TS 400 and whether the proposed alternative retains the "inherent usefulness" of the handheld cutoff saw.  The Court concludes that Defendant is entitled to judgement as a matter of law on this issue and that Plaintiff's claim of a design defect should be dismissed.

### 3. Manufacturing Defect

To plead a manufacturing defect under either negligence or strict liability, "the plaintiff

27

must show that a specific product unit was defective as a result of some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction, and that the defect was the cause of plaintiff's injury." <u>Colon</u>, 199 F. Supp. 2d at 85 (citation and internal quotations omitted).

Here, Plaintiff alleges that Defendants manufactured the TS 400 in an "unreasonable dangerous and defective condition." Compl. ¶¶ 29-32.  With respect to a manufacturing defect, Plaintiff fails to plead which part of the cutoff was defective, or in what way some particular defect caused Plaintiff's injury, as a result of a mishap in the manufacturing process, improper workmanship, or because of defective materials used in construction.  Thus, the Court finds Plaintiff's conclusory allegations and lack of proof are insufficient to defeat Defendants' Motion for summary judgment on this claim.

C. Negligence

New York courts generally consider strict products liability and negligence claims to be "functionally synonymous." <u>See</u> <u>Denny v. Ford Motor Co.</u>, 87 N.Y.2d 248 (1995) (citations omitted).  While the Second Circuit has characterized this aspect of New York products liability as unsettled because the New York Court of Appeals has yet to affirmatively hold that negligence and strict liability have merged, <u>see</u> <u>Jarvis v. Ford Motor Co.</u>, 283 F.3d 33, 63 (2d Cir. 2002), courts analyze both claims under a single test. <u>See</u>, <u>e.g.</u>, <u>Dalton v. Stedman Machine Co.</u>, No. 05 Civ. 452, 2008 WL 351676, at *6-7 (N.D.N.Y. Feb. 7, 2008); <u>Viscusi v. Proctor & Gamble</u>, No. 05 Civ. 01528, 2007 U.S. Dist. LEXIS 51307, 2007 WL 2071546, at *12 (E.D.N.Y. July 16, 2007); <u>Benner v. Becton Dickinson & Co.</u>, 214 F.R.D. 157, 164-65 (S.D.N.Y. 2003). Accordingly, the Court finds that Plaintiff's negligence claim be dismissed for the reasons set

28

forth above.

D. Breach of Warranty

1. Express Warranty

Plaintiff contends that Defendants breached their express and implied warranties that the cutoff machine would be fit for its intended purpose. "To establish the breach of an express warranty, the plaintiff must show that there was an 'affirmation of fact or promise by the seller, the natural tendency of which [was] to induce the buyer to purchase' and that the warranty was relied upon to the plaintiff's detriment." Tyler v. Kawaguchi Inc., No. 00 Civ. 6366, 2006 WL 581184, at *5 (W.D.N.Y. Mar. 8, 2006) (quoting Friedman v. Medtronic, Inc., 42 A.D.2d 185, 345 N.Y.S.2d 637, 643 (2d Dep't 1973)).  The plaintiff must set forth the terms of the warranty upon which he relied.  See Davis v. New York City Housing Auth., 246 A.D.2d 575, 668 N.Y.S.2d 391, 393 (2d Dep't 1998) (dismissing express warranty claim for failure to set forth terms of warranty) (citing Copeland v. Weyerhaeuser Co., 124 A.D.2d 998, 509 N.Y.S.2d 227 (4th Dep't 1986)); see also Arnold v. Krause, Inc., 232 F.R.D. 58, 74 (W.D.N.Y. 2004); Gonzalez v. Rutherford Corp., 881 F. Supp. 829, 845 (E.D.N.Y. 1995).

Here, Plaintiff does not identify the terms of the purported warranty he claims to have relied on.  Plaintiff's conclusory allegation that Stihl "breached any and all express warranties made or relating to the machine," without citation to any documentary evidence of a particular affirmation or promise made by Defendant, is insufficient to create a material issue of fact. Compl. ¶ 42-43.  Accordingly, the Court finds that Plaintiff's claim for breach of express warranty be dismissed.

2. Implied Warranty

29

To succeed on an implied warranty claim, Plaintiff must establish: "(1) that the product was defectively designed or manufactured; (2) that the defect existed when the manufacturer delivered it to the purchaser or user; and (3) that the defect is the proximate cause of the accident." Plemmons v. Steelcase Inc., No. 04 Civ. 4023, 2007 U.S. Dist. LEXIS 22954, 2007 WL 950137, at *3 (S.D.N.Y. Mar. 29, 2007) (citations and internal quotations omitted). Liability under strict products liability and implied warranty theory are essentially the same. See Dalton, 2008 WL 351676 at *7 (citing Denny, 87 N.Y.2d at 258-59). Here, Plaintiff has not alleged sufficient facts to distinguish his claim for breach of implied warranty from his claim alleging strict products liability based on defective design. Plaintiff's failure to distinguish these claims establishes that "the distinction between the defect concepts in tort law and in implied warranty theory is of no effect in the instant case." Arnold, 232 F.R.D. at 74 (citing Denny, 87 N.Y.2d at 262-63). The Court finds, therefore, that Plaintiff's claim for breach of implied warranty also fails for the reasons set forth above.

## V. MOTION FOR RULE 11 SANCTIONS

Defendants have filed a Rule 11 Motion for sanctions arguing that Plaintiff has known or should have known since Mr. O'Keefe's deposition that they could not prove the TS 400 was defective. Dkt. No. 81. The thrust of Rule 11 is to prevent baseless filings. E.g., United States ex rel. Robinson Racheria Citizens Counsel v. Borneo, Inc., 971 F.2d 244, 254 (9th Cir. 1992). Sanctions may be imposed only where an attorney fails to conduct a reasonable inquiry to determine that his papers are legally tenable, well grounded in fact and not interposed for an improper purpose. See Greenberg v. Sala, 822 F.2d 882, 886-887 (9th Cir. 1987) (affirming

denial of sanctions where factual errors did not render complaint factually frivolous); <u>Burke v.</u>

<u>Quick Lift, Inc.</u>, 464 F.Supp.2d 150, 163 (E.D.N.Y. 2006).

Rule 11 is not a license for the Court to sanction any action by an attorney or party in

which it disagrees.  <u>Aries Realty, Inc. v. AGS Columbia Associates</u>, 751 F.Supp. 444, 452

(S.D.N.Y. 1990), <u>citing</u> <u>F.H. Krear & Co. v. Nineteen Named Trustees</u>, 810 F.2d 1250, 1268 (2d

Cir. 1987).  Rule 11 has been violated only when it is clear to an objective observer that a claim

has absolutely no chance of success under existing precedents, and where no objectively

reasonable argument has been advanced to extend, modify, or reverse the law where it stands.

<u>DiPompo v. West Point Military Academy</u>, 708 F. Supp. 540, 551 (S.D.N.Y. 1989), <u>citing</u>

<u>Eastway Constr. Corp. v. City of New York</u>, 762 F.2d 243, 254 (2d Cir. 1985) (1987).

From a substantive viewpoint, Rule 11 sanctions should be limited to those which will

deter repetition of the alleged improper conduct or comparable conduct by others who are

similarly situated.  Fed. R. Civ. P. 11(c)(4).  In considering a motion for sanctions under Rule

11, the Court shall apply an objective standard of reasonableness.  <u>Burke v. Quick Lift, Inc.</u>, 464

F.Supp.2d at 163.  When examining the point at which an argument turns from merely losing to

losing and sanctionable under Rule 11, the Court must resolve all doubts in favor of the signer

of the pleading.  <u>Id.</u>, citing <u>Rodick v. City of Schenectady</u>, 1 F.3d 1341, 1350 (2d Cir. 1993).

Finally, "The Court has significant discretion in determining what sanctions, if any, should be

imposed for a violation . . ."  Fed. Rule of Civ. P. 11 Advisory Committee Notes to 1993

Amendments; <u>see also</u> <u>Lawrence v. Wilder Richman Sec. Corp.</u>, No. 09-4782-cv, 2010 U.S.

App. LEXIS 896 F.2d 704, 709 (2d Cir. 1990).

While the Court has granted Defendants' Motion for summary judgment in the present

case because no genuine issues of material fact remain, it does not find that an objective observer would conclude that Plaintiff's claims have absolutely no chance of success under existing precedents.  From the Court's perspective, Plaintiff and his attorneys argued in good faith that he suffered injury as a result of defects in the design and warnings of TS 400.  The Court therefore exercises its discretion under Rule 11 and finds that sanctions in the present case are unwarranted.


## VI.  CONCLUSION

For the foregoing reasons, it is:

**ORDERED,** that Defendants' Motion to exclude Plaintiff's expert (Dkt. No. 80) is **GRANTED**; and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 80) is **GRANTED**; and it is further

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**, consistent with this Memorandum-Decision and Order; and it is further

**ORDERED,** that Defendants' Motion for sanctions is **DENIED**; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on the parties.

IT IS SO ORDERED.

DATED:      March 31, 2010
            Albany, New York

Lawrence E. Kahn
U.S. District Judge